UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ELLEN NIGG-JOHNSON, | Case No. 20-CV-58 (NEB/LIB) |
| Plaintiff, | |
| v. | ORDER ON MOTION FOR SUMMARY JUDGMENT |
| LEWIS DRUG, LLC, | |
| Defendant. | |

Defendant Lewis Family Drug, LLC terminated Plaintiff Ellen Nigg-Johnson from her position as pharmacist-in-charge in 2017. (ECF No. 19 at 2; ECF No. 30 at 3.) Nigg-Johnson sued Lewis Drug for age discrimination under the Minnesota Human Rights Act ("MHRA"). (ECF No. 1-1 at 11.) Lewis Drug moves for summary judgment, and the Court grants the motion.

BACKGROUND

Nigg-Johnson worked as a pharmacist for 33 years. (ECF No. 29-1 at 2–34 ("Pl's Nigg-Johnson Dep.") at 3–5.) She was a pharmacist for Liebe Drug in Browns Valley, Minnesota from 2000–2014. (*Id.* at 6.) In 2014, Lewis Drug acquired Liebe Drug stores, including the Browns Valley location. (*Id.*) At the time of the acquisition, Nigg-Johnson worked as pharmacist-in-charge for Liebe Drug, and she continued in that position after Lewis Drug took over. (*Id.*)

In early 2016, when Nigg-Johnson was 59, Lewis Drug—through employee Jessica Strobl[1]—inquired about Nigg-Johnson's retirement plans. (ECF No. 20-1 at 2–52 ("Def's Nigg-Johnson Dep.") at 22–23.) Strobl asked her again in spring 2017. (*Id.* at 24–25.) Nigg-Johnson said no, she had no plans to retire. (*Id.* at 22; *see also* ECF No. 23-1 at 1.) After the second inquiry, Strobl emailed Bill Ladwig (Senior Vice President of Professional Services for Lewis Drug) and Traci Lund (Human Resources) about Nigg-Johnson's answers. (ECF No. 23-1 at 1.) The inquiry into retirement was based on a rumor that Nigg-Johnson intended to retire when Casey Goodhart, then a pharmacy student, graduated and could fill a full-time spot. (*Id.*) Strobl had also apparently spoken to Goodhart, because she told Ladwig that Goodhart "would definitely be interested in moving to the area." (*Id.*) Ladwig responded, "Thanks for the update . . . Traci and I will kick this around." (*Id.*) According to Ladwig, Lewis Drug typically asks employees about retirement in the spring because they need to know how many positions to fill with new pharmacy school graduates. (ECF No. 23 ("Ladwig Decl.") ¶ 7.)

*Wilmot Care Center*

Wilmot Care Center is a nursing home and an indispensable client of Lewis Drug's Browns Valley location. The Browns Valley store competes with another area pharmacy for Wilmot's business. (ECF No. 21 ("Tams Decl.") ¶ 7; ECF No. 24 ("Hammer Decl.") ¶

---

[1] The parties disagree on whether Strobl's position is superior to Nigg-Johnson's, but they agree she was not Nigg-Johnson's direct supervisor.

2

4.) Some Lewis Drug employees believe that without Wilmot's business, the Browns Valley location might be shut down. (Tams Decl. ¶ 10.)

According to the job description for the position, an essential duty of the pharmacist-in-charge is providing "excellent customer service." (ECF No. 20-1 at 53.) In 2017, Sherrie Hammer—a Lewis Drug employee and Wilmot board member—began to hear complaints from Wilmot about Nigg-Johnson's work. (Hammer Decl. ¶ 3.) Hammer heard that Nigg-Johnson was not cooperative with Wilmot staff and tended to brush off their complaints. (*Id.*) Hammer contacted Strobl and "asked her to contact Wilmot staff" and to "cut back the amount of contact that Wilmot staff would have with Ms. Nigg-Johnson, to smooth things out." (*Id.* ¶ 4.) Hammer also mentioned these concerns to Lewis Drug regional manager Brad Tams, who met with Nigg-Johnson. (*Id.* ¶ 5.) In part because of the meeting with Tams, Nigg-Johnson knew Wilmot had some concerns about her customer service, but she did not believe their concerns were serious. (Def's Nigg-Johnson Dep. at 29–30.)

Strobl continued to receive complaints from Wilmot via email, which she forwarded to management and human resources.[2] (ECF No. 20-1 at 63, 65–66, 71, 74, 99.) In these emails, Wilmot complained of missing prescriptions, incorrectly filled medications, and poor communication from Nigg-Johnson. (*Id.* at 65–66, 68, 71–72, 99–

---

[2] Nigg-Johnson correctly notes that Strobl forwarded one of these emails after Nigg-Johnson was terminated. (ECF No. 20-1 at 84.)

3

100.) Wilmot staff explained that the problems had worsened to the point that Wilmot nurses began to call Lewis Drug's competitor for pharmacy service, leading Lewis Drug executives to be concerned about losing the Wilmot account altogether. (*Id.* at 71; ECF No. 21 ¶ 7.)

*Narcotics Reporting*

On a Friday in August or September 2017, a "floater" pharmacist, Breanne Christensen, noticed that a 100-count bottle of hydrocodone was missing from the Browns Valley store. (Pl's Nigg-Johnson Dep. at 31; ECF No. 29-1 at 53–54.) The following Monday, a pharmacy technician told Nigg-Johnson about the missing pills. (*Id.* at 31.) On Tuesday, Nigg-Johnson did some investigation: she called Lewis Drug's Loss and Prevention Department to look at security video recordings, and she called the drug supplier to ask if there had been a mistake. (*Id.* at 32; Def's Nigg-Johnson Dep. at 42–43.) The next day, Nigg-Johnson asked Strobl to check inventory for the missing drugs. (Pl's Nigg-Johnson Dep. at 33.) Strobl did not respond to Nigg-Johnson's inquiry immediately, and Nigg-Johnson waited to follow up sometime "down the road." (Def's Nigg-Johnson Dep. at 42, 45.) Nigg-Johnson admitted, "I should have followed up, and I didn't . . ." (*Id.* at 45.) On the follow-up call, Strobl informed Nigg-Johnson that she needed to contact Bob Lubke, the compliance officer, to file forms per company policy. (*Id.* at 39.)

The relevant policy, Lewis Drug Policy I.03, provides that "[i]n the event that a discrepancy is noted" employees should double-check inventory counts and "[i]f all

4

records and counts are correct and a discrepancy still exists, the pharmacist shall contact the Lewis Corporate Compliance Officer." (ECF No. 29-1 at 105–06.) Reflecting federal regulations, the policy states that "[s]hould a . . . significant loss of any controlled substance occur at a pharmacy . . . within one business day of the discovery" the pharmacist must "[n]otify the DEA in writing" and "[c]omplete DEA form 106." (*Id.* at 106 (citing C.F.R. 1301.76 as requiring that a pharmacy report theft or loss of a controlled substance "within one business day" of discovery).) Nigg-Johnson had the policy; Lewis Drug sent it to her by email in January 2015. (Pl's Nigg-Johnson Dep. at 29–30; ECF No. 20-1 at 56–57.)

Despite the evidence of the email to her attaching the policy, Nigg-Johnson asserts that she was unaware of it. (Pl's Nigg-Johnson Dep. at 30.) She never signed an acknowledgment reflecting she received the policy. (ECF No. 29 ¶ 2.) And she had not attended the January 2015 staff meeting where the policy was discussed, which she contends is due to Lewis Drug's tardiness in sending an email invitation for the meeting. (*Id.* at 29–30.)

The parties agree, however, that Nigg-Johnson violated the policy, because she failed to report the loss to the compliance officer or submit the DEA form in a timely manner. The DEA investigates pharmacies for infractions like this, and Lewis Drug feared serious consequences from the error. (ECF No. 22 ¶ 9; Ladwig Decl. ¶ 9.)

5

Once Strobl pointed Nigg-Johnson to the policy, Nigg-Johnson offered to contact Lubke, but Strobl said she would do it instead. (Pl's Nigg-Johnson Dep. at 34.) Strobl informed Lubke of the shortage and asked who should fill out the DEA form. (ECF No. 29-1 at 102.) Strobl then told Nigg-Johnson to complete the form. When Nigg-Johnson did so, she marked November 10, 2017, the date she completed the form, as the "date of theft/loss." (ECF No. 29-1 at 103; ECF No. 25-1 at 11 (completed DEA form).) This was an error—the day of loss is the date of discovery of loss, not the date of form completion. Nigg-Johnson now admits her error, explaining that "[her] definition of day of discovery was not right." (Def's Nigg-Johnson Dep. at 40, 48.)

*Termination*

In December 2017, Lewis Drug terminated Nigg-Johnson. It gave two reasons: first, Nigg-Johnson did not provide "exceptional care" to Wilmot, an important client; second, Nigg-Johnson did not follow store policy for reporting discrepancies in inventory counts of controlled substances. (ECF No. 29-1 at 35–36 ("Term. Letter").) Following the termination, Strobl became the new pharmacist-in-charge. (ECF No. 20-1 at 85.)

6

*Lewis Drug Discipline Policy*

Lewis Drug typically conducts routine performance reviews and evaluations. (ECF No. 29-1 at 37–58 ("Lund Dep.") at 44.) It did not conduct an evaluation of Nigg-Johnson after its acquisition of Liebe Drug.[3]

Lewis Drug's handbook explains that the company uses "progressive discipline." (ECF No. 29-1 at 109.) According to the policy,

> [e]very employee has the duty and the responsibility to be aware of and abide by existing rules and policies . . . Lewis Drugs supports the use of progressive discipline to address issues at work. . . . Although, employment with Lewis Drugs is based on mutual consent and both the employee and Lewis Drugs have the right to terminate employment at will. . . . Disciplinary action may call for any of four steps—verbal warning, written warning, suspension, . . . or termination of employment—depending on the severity of the problem and the number of occurrences. . . . [T]here are certain . . . problems that are serious enough to justify either a suspension, or, in extreme situations, termination of employment, without going through the usual progressive discipline steps.

(*Id.*)

Nigg-Johnson received no discipline before her termination. According to Lund, who works in Human Resources, Lewis Drug may "jump steps" of the progressive discipline policy in "very serious" cases. (Lund Dep. at 52.) Nigg-Johnson knows of at least two other employees who were terminated by Lewis Drug without progressive discipline. (Def's Nigg-Johnson Dep. at 51.)

---

[3] Tams conducted site visits, but he describes these as store inspections and opportunities to talk with employees, not as formal performance reviews. (Tams Decl. ¶¶ 4–5.)

7

## ANALYSIS

### I. Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(a)). A dispute over a fact is "material" only if its resolution might affect the outcome of the litigation under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has 'the obligation to come forward with specific facts showing that there is a genuine issue for trial.'" *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013) (citation omitted). "A complete failure by the non-moving party 'to make a showing sufficient to establish the existence of an element essential to that party's case . . . necessarily renders all other facts immaterial.'" *Id.* (quoting *Celotex*, 477 U.S. at 322–23).

### II. MHRA Age Discrimination Claim

The MHRA prohibits an employer from discharging an employee based on the employee's age. Minn. Stat. § 363A.08, subd. 2(2). Claims under the MHRA are analyzed using the same evidentiary framework that apply to claims under the federal Age Discrimination in Employment Act. *Aulick v. Skybridge Americas, Inc.*, 860 F.3d 613, 620

8

(8th Cir. 2017). "An age discrimination plaintiff may survive the defendant's motion for summary judgment either by setting out direct evidence of discrimination or by creating an inference of discrimination" under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1152 (8th Cir. 2007).

Nigg-Johnson offers no direct evidence of discrimination, so the Court moves directly to the *McDonnell Douglas* analysis. Under this analysis, Nigg-Johnson first must establish a prima facie case of age discrimination. *Ramlet*, 507 F.3d at 1153. If she establishes a prima facie case, the burden shifts to Lewis Drug to articulate a "legitimate, nondiscriminatory reason" for terminating Nigg-Johnson. *Id*. If Lewis Drug can provide such a reason, the burden shifts back to Nigg-Johnson to show that the proffered reason was a pretext for age discrimination. *Id*.

### A.   *Prima Facie Case*

To make out a prima facie case of age discrimination, Nigg-Johnson must show that (1) she was a member of a protected group; (2) she was qualified for her position; (3) she was discharged; and (4) the circumstances of the discharge give rise to an inference of discrimination. *Id.* The parties dispute only the second requirement.

*Undisputed Elements.* Nigg-Johnson was 61 when she was terminated, making her a member of a protected class who was discharged from employment and satisfying the first and third elements of a prima facie case. Strobl, who is younger than Nigg-Johnson,

9

was her replacement. This replacement satisfies the fourth prong. *See Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d 848, 855 (8th Cir. 2003) ("Replacement by a younger person is ordinarily sufficient circumstantial evidence to demonstrate that age was a factor in the termination decision.").

*Qualified for her position.* As to the second element, Lewis Drug argues that Nigg-Johnson's poor job performance shows she was not qualified. It cites *Richmond v. Bd. of Regents of the Univ. of Minn.*, 957 F.2d 595 (8th Cir. 1992), in support. The *Richmond* court found an employee's poor job performance for 18 months—with several warnings and chances to improve in that time—evidenced that the employee was not qualified. 957 F.2d at 598. Unlike in *Richmond*, the evidence here does not suggest Nigg-Johnson was unqualified; it seems Nigg-Johnson could complete most of her job duties and may have been unaware of office policies, rather than unable to abide by them. In any event, the *Richmond* court also found that Richmond's employer offered a nondiscriminatory reason for termination and that Richmond offered no evidence of pretext. *Id.* This Court also need not decide whether Nigg-Johnson's errors defeat a prima facie case because, as explained below, the Court finds no dispute of material fact as to pretext.

### B.    *Non-Discriminatory Reason*

Lewis Drug has articulated a legitimate, nondiscriminatory reason for Nigg-Johnson's termination: poor performance. *See Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014) ("[P]erformance-related concerns constitute legitimate, non-discriminatory

justifications" for discharge). This Court cannot "sit as [a] super personnel department reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Barnhart v. Open Harvest Co-op.*, 742 F.3d 365, 371 (8th Cir. 2014) (quotations and citations omitted). The employer just needs to state a nondiscriminatory reason; it is not for the Court to determine whether that reason is persuasive or credible. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000) ("This burden is one of production, not persuasion.").

Lewis Drug cites Nigg-Johnson's failure to timely report a missing narcotic and her strained relationship with Wilmot as evidence of poor performance. This is a nondiscriminatory reason for termination, and so Lewis Drug has met its burden of production.

C.   *Pretext*

The crux of this summary judgment motion is found at the pretext stage. To establish that an employer's reasons for terminating an employee were pretext for age discrimination, an employee "may show that the employer's explanation is unworthy of credence because it has no basis in fact. Alternatively, a[n employee] may show pretext by persuading the court that a prohibited reason more likely motivated the employer." *Aulick*, 860 F.3d at 621 (citation omitted). "Proof of pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact as to whether the termination was motivated by intentional discrimination." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948,

11

955 (8th Cir. 2012) (citation and quotation marks omitted). Nigg-Johnson presents several arguments as pretext, none of which create a triable question of fact about whether Lewis Drug terminated her because of her age.

Nigg-Johnson cites to the two inquiries about retirement to suggest that Lewis Drug considered her age when it terminated her. When retirement inquiries are "unnecessary and excessive" they may "constitute evidence of discriminatory harassment." *Montgomery v. John Deere & Co.*, 169 F.3d 556, 560 (8th Cir. 1999). But "an employer may make reasonable inquiries into the retirement plans of its employees." *Id.* Ladwig testified that Lewis Drug's standard practice is "to ask all of our pharmacists to keep us informed of any retirement plans . . . [when] we begin our interviews and hiring of new pharmacists who are graduating college later in the spring." (Ladwig Decl. ¶ 7.) Nigg-Johnson claims that Strobl asked her about retirement plans twice after she turned 59, but she has not presented evidence that these inquiries were unnecessary and excessive. (Def's Nigg-Johnson Dep. at 22–25); *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 502 (7th Cir. 1992) (declining to infer discrimination from two inquiries into retirement), cited by *Cox v. Dubuque Bank & Tr. Co.*, 163 F.3d 492, 497 (8th Cir. 1998). The mere fact that an employer asked about an employee's retirement plans does not suggest pretext for age discrimination.

Nor does the timing of Lewis Drug's inquiries suggest pretext. Several months passed between Lewis Drug's inquiries about retirement and Nigg-Johnson's

12

termination. Although the Court can consider evidence of timing, several months between a protected activity and termination usually forecloses any inference of discrimination. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832–33 (8th Cir. 2002) (considering situations when timing gives rise to an inference of pretext in retaliation suit). More importantly, significant performance problems arose in the interim, so a factfinder could not infer pretext from timing. *E.g.*, *Nemec v. Wal-Mart Assoc., Inc.*, 14-cv-4450 (RHK/LIB), 2015 WL 8492040, *5 (D. Minn. Dec. 10, 2015) (finding no inference of discrimination from positive performance evaluation before termination when a pharmacist violated the employer's policies between the evaluation and termination) (citing *Smith*, 302 F.3d at 834).

The other types of evidence Nigg-Johnson raises do not implicate age either. Instead, they show that Nigg-Johnson was not fulfilling the responsibilities of her position. For example, Nigg-Johnson believes a factfinder could infer pretext from Lewis Drug's decision to terminate her instead of the floater pharmacist who first discovered the missing hydrocodone. Nigg-Johnson is correct about the law; an employee can show pretext with evidence that "the employer routinely treated similarly situated employees who were not in the protected class more leniently." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 867 (8th Cir. 2006). But the test for determining whether an employee is similarly situated is "a rigorous one." *Bone*, 686 F.3d at 955. To succeed, Nigg-Johnson must show that she and the floater pharmacist were similarly situated in all relevant aspects. *Id.* at

13

956. She has not. Nigg-Johnson worked as a pharmacist-in-charge, not a floater pharmacist. (ECF No. 32 ("Def's Reply") at 11.) No facts in evidence suggest that the two pharmacists were "subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 720 (8th Cir. 2008). And nothing in the record suggests that Lewis Drug treated the floater pharmacist differently because of an age difference rather than a difference in job responsibilities.

Similarly, Nigg-Johnson asserts that a factfinder could infer pretext because "[t]he string of complaints [from Wilmot] were never discussed with or emailed to" her. Sometimes, a delay between identifying a problem and dismissal "reasonably suggests that the [employer] did not want to provide [the employee] with an opportunity to address [her] weaknesses, and thus supports the inference that [the employer] had an age-based agenda to terminate [the employee]." *Ryther v. Kare 11*, 108 F.3d 832, 841 (8th Cir. 1997). True, Lewis Drug could have better engaged Nigg-Johnson in repairing the relationship with Wilmot, and in some cases failure to do so might suggest pretext. But here, Nigg-Johnson knew about Wilmot's concerns but did not seek to remedy them, even though "excellent customer service" was one of her essential duties as chief pharmacist. (ECF No. 20-1 at 53).

It was also Nigg-Johnson's responsibility to know about the drug-reporting policy; whether she actually knew about it is immaterial to evaluating whether Lewis Drug's

14

proffered reasons were pretextual. (ECF No. 20-1 at 53 (providing that the chief pharmacist's "essential duties and responsibilities" include "[m]ak[ing] sure that all functions of the pharmacy comply with all federal, state, and local laws, regulations")); Minn. Stat. § 6800.2400 subd. 1(F) (including in the "Pharmacist-in-Charge's duty and responsibility . . . to establish and supervise the method and manner for the storing and safekeeping of drugs"); s*ee Nemec*, 2015 WL 8492040, at *7 ("[W]hether [s]he actually knew what was in [the policy] or whether [s]he knew [s]he was violating it, is immaterial."). The only relevant question is whether she followed the drug reporting policy, and Nigg-Johnson admits she did not.[4] (Def's Nigg-Johnson Dep. at 45.) This violation of policy was sufficient grounds for Lewis Drug to terminate Nigg-Johnson.[5]

---

[4] In an email from Lubke to Ladwig, Lund, and Tams after the narcotics were reported missing, Lubke "appears fine" with Nigg-Johnson's actions. (Pl's Br. at 28 (citing Lund Dep. at 53; ECF No. 29-1 at 104).) Nigg-Johnson thinks a factfinder could infer pretext from this indifferent tone. But the tone of a single email does not suggest Lewis Drug's stated reasons were pretext for age discrimination.

[5] Nigg-Johnson believes a factfinder could infer pretext because Lewis Drug's reasons for terminating her were not based in fact. But they were based in fact. Nigg-Johnson admits to the problems with the Wilmot relationship. (Pl's Br. at 7; Pl's Nigg-Johnson Dep. at 12.) And she does not deny that she should have reported the missing hydrocodone sooner. (Def's Nigg-Johnson Dep. at 45.)

Moreover, Lewis Drug consistently cited both the problems with Wilmot and the lost hydrocodone as reasons for Nigg-Johnson's termination. (Term. Letter.) So although Lund stated that she hoped they could work on repairing the relationship between Wilmot and Nigg-Johnson before the hydrocodone went missing, (ECF No. 20-1 at 105), this tracks the reasons given in the termination letter. *See Sieden v. Chipotle Mex. Grill, Inc.*, 846 F.3d 1013, 1018 (8th Cir. 2017) (holding that a plaintiff "must show that the reasons are *completely different*, not minor discrepancies.") (emphasis added); *see also Smith*, 302

Though Nigg-Johnson did not follow company policy, Lewis Drug did.[6] Generally, Lewis Drug follows progressive discipline. The policy explains that employees have a duty to be aware of company policies and that steps may be skipped. (ECF No. 29-1 at 109.) In fact, the record suggests Lewis Drug terminated two employees in the past without following progressive discipline. (Def's Nigg-Johnson Dep. at 51.) So although an employee can sometimes prove pretext through evidence that the employer varied from its normal policy or practice to address the employee's situation, nothing about Lewis Drug's departure from its usual policy of progressive discipline suggests pretext.[7] *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 874 (8th Cir. 2008); *Hite*, 446 F.3d at 867 (explaining that an employee could show pretext because he "was discharged pursuant to an inconsistent policy").

---

F.3d at 835 (finding no inference of pretext where the employer added another reason for termination without abandoning the original reason).

[6] Nigg-Johnson asks the Court to find that Lewis Drug did not follow policy because it did not conduct a proper investigation of how the narcotics went missing. (Pl's Br. at 29.) But she does not raise any evidence to suggest Lewis Drug had a particular policy related to investigations. (*Id.* at 29–30.) Without a policy in place, there can be no violation of it.

[7] Nor does Lewis Drug's admitted failure to follow its policy of conducting routine performance evaluations. Lund testified that performance evaluations should be conducted "at least annually," but Nigg-Johnson had not received one. (Lund Dep. at 44; Tams Decl. ¶¶ 4–5; Pl's Br. at 26–27.) Although the Court does not condone an employer's failure to complete performance evaluations, a failure to complete an evaluation does not, on its own, give rise to an inference of discrimination, particularly when problems arose after the evaluation would have been given. *Nemec*, 2015 WL 8492040, at *5 (finding no inference of discrimination when significant performance problems arose between a positive performance evaluation and termination).

Nigg-Johnson has not shown that her age played a role in Lewis Drug's decision to terminate her. None of the reasons offered by Nigg-Johnson suggest that Lewis Drug's stated reasons for terminating her were a pretext for age discrimination. The Court grants the motion for summary judgment.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, Lewis Family Drug, LLC's Motion for Summary Judgment (ECF No. 17) is GRANTED. LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: February 3, 2022                    BY THE COURT:

                                                                 s/Nancy E. Brasel
                                                                 Nancy E. Brasel
                                                                 United States District Judge